Before we begin the session today, I just want to give our thanks to the Catholic University for providing us with this beautiful courtroom for today. As some of you may know, we are a circuit court, and in the good old days, the circuit judges used to ride circuit. We've not done that. First of all, we have a pretty small circuit, namely only one jurisdiction, so we haven't really been called to do that, but over the last year and a half, we have been trying to get around a little bit into the circuit, and this is our opportunity to do that, so we came here today. Unlike yearly judges, we did not ride our horses to get here. The marshal will call the first case. Case number 13-7189. Christopher Baumann, Chairman of the Paternal Order of Police, Metropolitan Police Department Labor Committee, Appellant, v. District of Columbia, et al. Mr. Conte for the Appellant, Ms. Weston for the Appellant. Thank you. If you could just hold on one second, we're having a minor technological problem. Don't worry. This doesn't count against your argument in time. Okay. Well, maybe we did ride our horses here after all. Please proceed. Good morning, Your Honors. Anthony Conte on behalf of the Appellant, Christopher Baumann. May it please the Court. We're here today asking this Court to resolve a question of my client's First Amendment rights, and in doing so, this Court is called upon to balance my client's right to convey actual facts through a police radio recording that exposed the potential unnecessary use of deadly force in an effort to promote both officer safety and public safety versus the Metropolitan Police Department's interest in avoiding being discredited by the truth. The facts of this case involve an exchange of gunfire between a suspect and members of the MPD's gun recovery unit. The suspect fled and holed himself up in a home, and a barricade was declared. Well, let me ask, in your brief at page 20, you start by saying, the 2009 investigation was undertaken purely as retaliation for Chairman Baumann's criticisms of the police actions and presenting the police in a bad light in violation of his First Amendment rights. So is your focus the retaliation in turn on the 2009 investigation? The retaliation on the investigation, yes, and then the recommendations of discipline flowing from that. In other words, what I'm getting at is some of the statements you just made and some of the points in your brief are not directed solely to that. So I want to be clear exactly how you're focusing your argument. And, Your Honor, we are focusing our argument on the media criticisms that Chairman- I understand that, but is the focus that as a result of what your client said, there was an investigation in 2009 by the Internal Affairs Division, and that is your challenge, that that's the nature of the retaliation which you're challenging? Correct, and the recommendations of discipline running afoul of his First Amendment rights. Well, I didn't see too much in your brief about that, but the government responds, as you know, by saying some of the protected speech arguments are forfeited because they're not developed in your brief. Well, the district's argument is that the retaliation argument was forfeited, and the district's argument is that because we spent so little time on the retaliation component, we forfeited it. And admittedly, we did spend a little time on it because we don't believe it is the central issue. The district, through the investigative packet, conceded that discipline was being recommended because of the release of the recording to the media. So in terms of a causation analysis, it's conceded. The real question for the court is whether or not that speech is protected. I think what we're trying to focus on is what speech we're talking about. And at some point below, there were arguments in addition to the investigation. There were arguments about speech to the committee, to the union committee, about email, those sort of things. And the government's position is, accurately describing your brief, that you did not raise those in your opening brief. So instead, your argument, the First Amendment speech we are talking about here today is the release of the information. That is, the release of the tape and the investigation. The release being the speech and the investigation being the retaliation. Is that right? And that's correct. That is the focus. You don't, Mr. Conte, dispute that the police department can have a policy under which individuals who want to release documents need to at least alert them or check with them in advance. And I don't think you dispute that if a document that a police department employee proposed to release did in fact jeopardize an ongoing investigation, that under our First Amendment precedence, the police department would have an entitlement to withhold that and have the employee disciplined if the employee did release that. We don't dispute that, but there is no policy of that nature. I'm just asking if you, I mean, I have a series of questions and I just wanted to clarify. I believe that you're not saying that the police department has no entitlement to look at documents that employees proposed to release in advance in order to serve the department's interest in protecting ongoing investigations against being jeopardized by release of documents that shouldn't be released. They could create a constitutional policy, yes. Okay. So your challenge here is that this isn't such a policy and or that this release was not something, the release of which would jeopardize an ongoing investigation. It's both. Yeah. So can you focus first on the second? The police chief and the department has claimed that there was, I guess there were two ongoing investigations. One was into the suspect that they were trying to apprehend. That was a criminal investigation. And the second was that there had been a discharge of firearms and the suspect actually had been wounded and they, as a routine matter, there's always an investigation of that, right? Correct. And so both of those were pending at the time that your client released this transcript. Is that right? That's correct. And so tell me your position about why, nonetheless, the department had no entitlement to prevent the release of the transcript. Well, foremost, the ERT transcript had nothing to do with either of those investigations. There were two reasons articulated by the lower court for why the release jeopardized the MPD's operations. First, the lower court determined that the release of the information contained tactical and confidential information. The release, the 14-minute transcript that was released did not contain tactical or confidential information. But let me be clear. The ERT tape that was released was of the barricade incident that led to the two investigations Judge Pillar just mentioned. Actually, no, Your Honor. This is a completely separate incident? One of the investigations was a FIT investigation, a use-of-force investigation. That involved the exchange of gunfire between the suspect before ERT took over. The barricade situation first began with the gun recovery unit exchanging gunfire with this member. The member became holed up in a home. ERT responded because a barricade was declared. When ERT responded, they took over the scene. In taking over the scene, they communicate on an ERT radio only. But is it your position that there could necessarily be nothing on the tape that would be relevant to either of the two investigations? Our position is that, indeed, there was nothing relevant. Is that the standard, whether it's relevant? Well, the standard is that the government must prove actual harm and actual interference. This court has held such. The Sanjor case, it's not enough for the court to reasonably infer, which is what the lower court did, that an investigation could be jeopardized. The court is required to determine the investigation was actually jeopardized. Well, how would it know? It's just begun the investigation. They have a tape of an incident that's being investigated. They may not know the significance of the tape until the investigation proceeds. But that's the government's burden under Pickering. You mean you can't start even an investigation until you already know the results of the investigation? Is that the argument? You said that you didn't think there was something in the tape that was relevant. No one could possibly know that until they investigate that. Are you saying it's unlawful or that the police department is at risk by even investigating the question? If the motivation of the police department is to investigate because the recording discredited the department, yes. In the beginning, all we have is a released tape. Wouldn't you think there has to at least be an investigation to determine whether the released tape releases anything confidential or not? There was a preliminary inquiry done by the Office of Unified Communications. The Office of Unified Communications. This is a criminal investigation to begin with. And the chief of police letter says we gave the tape to the United States Attorney's Office, to a particular United States attorney for a criminal investigation, right? Correct. Isn't it appropriate to first at least look at the tape at that level of investigation? Is there anything inappropriate about starting an investigation? And our contention is that that was done by the Office of Unified Communications. They reached out to both the U.S. Attorney's Office, at least the investigator working with the U.S. Attorney's Office, and the FIT investigator to determine if releasing this recording would jeopardize it. And a determination that might keep it confidential, and Cunningham only got it when he signed saying that he understood the release was for internal purposes only. Cunningham is not the plaintiff in this case. I understand, but your client got the tape from Cunningham. Correct. And so what I'm trying to get at is the department had already looked at the tape and made a determination, at least preliminarily, that it was confidential and should be used internally only. I'm just trying to understand what the standard is. Who makes the determination? And I just referenced you to the Supreme Court's decision in NTEU where the court notes that where the government's interest is involved gives some deference to its predictions of harm. So we're at the very beginning here. And that's what we're focusing on. And you're saying your client, under the First Amendment, has the authority to determine the relevance of a tape, and that that is the basis on which he is entitled to release it. We're saying that my client has the right to release the recording, and if the government wants to stop the release of the recording, it bears the burden of demonstrating that that actual recording will actually harm the ongoing investigations. So it doesn't have to be a retrospective. They can have a prediction that it would harm, right? They can believe that release of it. I mean, they don't know yet, really. As Judge Garland was saying and the judges were saying, it's not entirely clear how all the puzzle pieces are going to fit together. But they have to make a case that this is something that we can reasonably conclude likely could harm an ongoing investigation, something along those lines. No, I think they have to be right. They have to be actually correct that it will, and if they don't, they bear the burden and they run afoul of the First Amendment. How does that square with the Supreme Court's decision in, I think it was Waters, where if the employer is wrong about the facts, but had a reasonable policy of reviewing the material and reasonably concluded that it was in the employer's interest, that they can, in fact, discipline someone for disclosure? Well, I think the distinguishing point is that the district didn't have that basis. Well, so I know there's two layers to your argument. Let me just back up because you had said that there were two bases in the lower court. One was that the lower court concluded this was tactical and confidential information and we didn't let you get to your second point. The second basis for the district court's determination was that they thought it would discredit the department. Well, no, the second basis was that it would interfere with their operations. And what I would direct the court to is in the record, Joint Extract, page 718. Here, a public employee relations board hearing examiner took testimony from all of the ERT witnesses, Tammy Cramer from the Office of Unified Communications. He concluded that while the MPD's position was that the recordings wouldn't have been released because of these two ongoing investigations, that the MPD's claim that the release would have been blocked by these two investigations is without merit. What this hearing examiner concluded after hearing all of the evidence was not only, and this was conceded by the district that the hearing examiner concluded, not only was there nothing tactical, not only was there nothing confidential. I'm still not following why that matters in the end, so let me ask you a series of questions. So the finding against your client is the violation of the general order C1 and C7, right? Correct. C7 is that you released a document not listed as releasable, correct? Correct. And that's in Part C. And Part B lists the documents that are releasable. So this is a particular kind of police document that is not on the list of things that can be released, right? It's just a flat rule that you can't release this kind of document, right? Well, it's a recording. We're not discussing a document. I'm sorry, I'm using the word document to include recordings. Understood. So are you saying that the police can't have a flat rule, not a balancing rule, just a flat rule that says you can't release recordings of ERT actions, at least until the end of the criminal investigation, and that in each case this has to be balanced? Is that what you're saying? I don't even think that is the rule. So their rule, if you look to the prior subsection, is that you can't release it if it would impair the investigation. And that's what's material. There's two different rules that your client was found to have violated. The first was confidential information that may jeopardize the successful conclusion of the investigation. That's what you're talking about. And seven, all documents not listed as releasable, right? There's a list of the things that you can release. An officer can release factual information concerning the individual involved, the circumstances surrounding the incidents, time, place, possessions of weapons. All that can be described, a general description of the item seized, information that may assist the investigation, general complaint files, printouts, automatic accident reports. All those things can be released, right? With permission of management. Well, is that right? Every subsection defines a member of management at the rank of lieutenant or above. And this one is one that can't be released. This is not one of those sets, so it can't be released. This is the default rule, is every document or piece of material. Let me see if I can define this a little more narrowly. There is a federal rule of criminal procedure, Rule 60. It says you can't release grand jury information, right? That's what it says. It doesn't matter whether the grand jury information is important in the end, relevant. It doesn't matter whether the grand jurors are discussing lunch. You can't release it. An officer of the court, prosecutor, cannot release it, right? We don't do any balancing of any kind, right? And is that a violation of the First Amendment? Say I'm a grand juror and I decide, you know what? I've looked at this transcript. It actually doesn't say anything important. I'm going to send it to the Washington Post. Do we then balance and determine whether or not it was important or wasn't important? Well, I think that in enacting that sort of statute, balancing would be required. But in that situation, I think balancing would favor nondisclosure. Let me bring this even closer to home. That woman over there is my law clerk. I'm sure she knows, and after this disposition, after we have this meeting, this discussion with you, the judges are going to meet, we're going to decide the case, and I'm going to write a disposition memo which explains our disposition, okay? We haven't discussed this before. I'm sure my law clerk knows that if she releases that document to the press before the opinion comes out, I will fire her. And I want to be sure she knows that. Just to be clear, if you do that, I will fire you. Now, she looks at the information from our disposition memo, and she says, one, it wouldn't hurt to release it because the opinion is going to come out in a day or two anyway, so who cares? And two, it shows some stuff about the way in which judges actually behave behind closed doors, and the public should know that kind of stuff. Now, do I have to say anything in response? Can I just fire her? Do I have to explain why there's a balancing here? I don't think it's you that has to do the balancing. I'm going to say she does it, and I fire her. Now what happens? She sues for the First Amendment retaliation. And she might retain me, and I would say that I think the court would need this balance. No, there's no contingency. I would say the court would need to balance that. What is the public interest at issue, and is it, like in our case, concededly a strong public interest? So that's what I thought you were going to say, and I want to make clear that you are suggesting a sea change in the way in which the court, for example, works. I think that members of the court would be stunned to learn that if internal documents can be released and the only way somebody can be fired is if we know in advance that that particular document is, shouldn't, you know, the public benefit is not outweighed by the benefit of the court. That would totally change the way in which we act. And Rule 6E similarly says the events occurring in the grand jury are private, are confidential, and if a prosecutor releases them, he goes to jail. Similarly, there's a statute about wiretap. Now I'm getting close to a real case. The statute says if you disclose the existence of a wiretap, you go to jail. You don't balance whether disclosing the interest of the wiretap is important or not. You just go to jail. And in the Boehner case, we said the following. I just want to read it to you. Aguilar, which is the case about the wiretap, stands for the principle that those who accept positions of trust involving a duty not to disclose information they lawfully acquire while performing their responsibilities have no First Amendment right to disclose that information, period. The court says there are many federal provisions that forbid individuals from disclosing information they have lawfully obtained. The validity of these provisions have long been assumed. Grand jurors, court reporters, prosecutors, for instance, may not disclose a matter occurring before the grand jury. The Privacy Act imposes criminal penalties on government employees who disclose agency records about identifiable individuals. The employees of the IRS may not disclose tax return information. And in none of those circumstances, if an employee does those things and is fired, is there any case ever that has said that we will balance that individual piece of information, public interest, against the government's interest? So how does your argument square with the holding in the Boehner case and the implications of your rule for all of this court's internal papers? Well, I think the difference is that when you're talking about a case that involves a broad sweeping policy that regulates a large group of folks and it's being challenged on a policy level... Okay, let me be clear. I'm the chief judge of the court. I'm making a policy for our entire court. Every judge, every... I can't fire a judge, needless to say. The Constitution would forbid that. But every law clerk, every staff member, anybody who discloses internal court documents will be fired. And I think everybody knows that that's the rule. You're telling me that I can't do that? I can't make that rule without violating the First Amendment? Well, what I'm saying is I think that the way that a court would look at that rule is to determine whether or not such a sweeping prohibition is justified. And there would be balancing. It wouldn't be the particularized balancing of the actual facts and circumstances of the particular case. Fair enough. So you have both. And would I have to testify in that case as to my reasoning or would the court understand that some things are obvious, some things are per se, without me having to testify or put any facts into the evidence about my own reliance on the confidentiality of internal papers? Well, what Pickering and NTU say is if you have a circumstance in a situation where the public interest, where it's private speech and there is a public interest and you've established that, now the burden shifts to the government and so the government would have to put that evidence up. And what burden do you think the government has in terms of its evidentiary showing? It's not enough, I gather from your responses to Chief Judge Garland, to suggest that it's obvious that something may be relevant to an investigation. What more must the government present? In this case, as to this particular disciplinary action, the government was required to present evidence that it actually interfered with ongoing investigations. Well, the government, you mean after the fact? Yes. Once we've established as the plaintiff, as the appellant, that we are providing private speech in a public interest, which has already been determined by the lower court, then it shifts and the government has the burden. And the burden is not simply hypothetical. The burden is actual. I think there's one of the things that's a little bit confusing to us, and it's partly the way the case was presented, and the doctrine is also somewhat confusing on this. There are really two levels of analysis, and one is the policy, and the next level is in the individual case. My initial question to you was really hoping to put aside the question of the policy, because I don't think you are disputing that had they written a policy that covered only information that would jeopardize pending investigations, they would be fine. And what you're saying is, well, this application reached something that actually didn't jeopardize a pending investigation, because the policy is written in a way that is broader. All the government said was it's related. They didn't say it would jeopardize. They've actually now looked at the document. They imposed discipline. They were able to make a judgment after the fact, so all of our predictions under our hypothetical policy don't have to be made here. They've looked at this. And, in fact, they rescinded the discipline, and they expunged your client's record. No? No. They rescinded half of the discipline. Okay. They rescinded the charge that my client discredited the MPD. Okay, so perhaps that's a little distracting. But so they've had a chance to look at it. And as I take it, your claim is a claim that this policy was susceptible of unconstitutional application. It wasn't as narrow as it should have been to survive the kind of challenge that Chief Judge Garland was posing, like, you know, disposition memos, all of them confidential, period. That policy is constitutional. Here we have a policy that says, well, anything not listed is presumed confidential. And you're saying, well, not everything under that policy can constitutionally be withheld, e.g., this tape in the circumstance of my client's case. So you don't necessarily have to take on the whole policy. As I understand it, you're taking on the discipline that was meted out to your client in this case. And they're saying, oh, but it was good under our policy. And you're saying, well, no, you have to defend it under the First Amendment, which is similar to what, you know, this court has done. And I think in Senjor and Weaver, we've looked at the interaction between a policy and an individual discipline. So I get that you're focusing on the individual discipline. To me, you're in a clear posture. And I'm wondering, you know, am I right that that's the way we should think about the case? I certainly think that's the way you should think about the case. However, I will say that there's both aspects of the challenge. The government has taken the position that through the disciplinary packet that my client should have sought approval before releasing the recording. That's in the disciplinary packet. That was one of the reasons my client was recommended for discipline. He did not seek approval. There's nothing in the media policy that lays out how to seek approval, what criteria would be used. And what courts have said is that when you have that sort of a preapproval process, when you have that sort of a prior restraint where there's unfettered discretion, the risk is viewpoint discrimination. And that's precisely what happened in this case. And or just prior restraint of information of public concern that they don't have any right to viewpoint or not. Well. It's two different persons having concerns. Correct. In our opinion, and I think it was Weaver, the panel was very careful to read the State Department's policy not to impose a prior approval requirement, but to say there's only a prior review requirement. And that is constitutional. You have to give the employer a chance. If they're quick, if they're going to let you go out with it no matter what, if you have First Amendment rights to bring it to the public. They just have a, if the employer has an interest in seeing what government documents on matters of public concern, its employees are planning to release, and that the court upheld. And so I think you're saying, well, this isn't Weaver. Because here they're saying, you don't have to just come and check with us. We're going to hold it back. And worse. Well, worse. We're not going to even tell you that there's a process. We're not going to tell you the timing of which we'll review the material. And we're not going to tell you perhaps even our decision. And that's unfettered discretion. And it does run the risk of viewpoint discrimination, which actually occurred here. My client was recommended for discipline for discrediting the MPD. My client released a recording that had on it that officials that were at a barricade interfered with the barricade and tried to order the deployment of gas. Mr. Connolly, I actually didn't see that in the excerpt that was in the record. It's actually almost comically confusing how little of it we have. People talk about, oh, it shows outside interference. Is the whole transcript in the record on appeal? I don't know that it is. What's material, or at least to the district's case, was quoted. And what's material to our case as well. I'm being given the go-ahead to use gas. And it says we're not ready. And they didn't use gas. I'm being pressured. Pressured. Right. Pressured. And what was occurring at the command post was that there were officials interfering with the emergency response team. No. What occurred was the media was questioning whether or not there was a gas deployment order. And one of those officials told the media there was never any order regarding gas. And what my client was exposing by releasing the recording was that the MPD was covering this up and that they were lying to the media. It's still a little confusing. All the cases that you mentioned in your colloquy with Judge Pillard, not one of them involves a government document, right? They all involve speech or things written by the employee, correct? Correct. The only case we have that involves a government document is Vayner. And that's the one that says you've got no First Amendment right to disclose it, right? Not balancing, not anything else, just no right. I think there was one other that involved the release and the preapproval process for releasing secured documents. That was not about releasing secured documents. That was about somebody writing a book, which might include confidential information in his own book. That's SNAP and those related cases. Okay. Yes. Just again, because I have your point, though, that if we have a flat rule that says no release of our disposition memos, you do think that that requires a balancing. Or if I have a flat rule that just says no release of any internal court documents, you think that that can be challenged either if somebody releases one because it has something really important in it, or it can be challenged on its face, that it might be too broad or not justified, right? Yes. I think the First Amendment stands above a court's policy. And if the chief judge is hypothetical, what type of evidence would have to be shown in that instance? I think it probably would be a pretty easy case for the chief judge because there are quite powerful and legitimate reasons to protect that confidentiality. Well, I thought, based on your argument here, suppose there's a disposition memo in Case A, and it says the court is going to affirm for the following three reasons. And that's exactly what the court does. So releasing the document, as I understand your argument, didn't harm the process in any way. The real question would be then what was the compelling public interest in releasing the document that makes it speech protected? Well, suppose it's about a very controversial matter. Suppose judges dispute whether originalism or purposivism should be, I hope the law students understand what I'm talking about, should be the correct way of studying this, and one judge says one, one says the other, and the bottom line disposition is we're going to mix them together. And that is what comes out. That debate about originalism and purposivism, that seems like a very big, if you read any of the law blocks, you will certainly see that that is a subject of enormous public interest, at least among the law community. And the law clerk would also need to be speaking as a private citizen. Remember, my client was not speaking as an MPD police officer. She would be speaking as an interested member of the legal community who wants the legal community to know how judges actually decide their cases. That's exactly what you're saying is happening here, right? And that's what makes your client speaking as a citizen on a matter of public interest. The thing that's different is that under this policy you could say all the things that were in this case and not be subject to the policies. The problem is the release of the tape itself, which isn't just his speech, right? He's releasing something that was generated by and is part of the department's work. Well, but the importance of that release is speech. It's actual fact that demonstrates that the department... Right, but they've conceded that this is speech on a matter of public concern. The dispute is when and whether the government's interest, and they've asserted interest relating to pending investigations, outweighs that interest on the part of the employee. And as you know, the public employee's speech rights are diminished compared to that of an unaffiliated citizen. And the employer has strong prerogatives to run the department as they need to. And so the question is, in what situations have they articulated enough? Can they do it in general terms or do they have to do it case by case? And when and why might they have to shift from having a general, presumptively valid policy where they don't have to give an individualized reason to, as you're saying, an individualized reason in this particular case. And I suggest that maybe when the policy's categorically valid, as with court deliberative process, then there wouldn't need to be an individual justification. All of our deliberative process is weighty enough to, I think, outweigh the public employee's speech interest on this case. Whereas here, I think your case has to be, no, not every piece of paper in the police department that might be relevant to an ongoing investigation has a significant enough government interest for them to keep it secret. So I think that that's the decision you're making. Well, that is. And that's why earlier I wouldn't concede that there is no sort of facial aspect to the challenge in this case, because there is. I think you get nowhere on facial, because you have to show that the bulk of applications are unconstitutional. And there's a tremendous number of applications, I'm sure, that are constitutional. You get your client's rights protected if you make the case that we are, on this policy, required to look at the individual instance because of the policies offered for us. And in that, once we do that balancing and require them to come forward, you win. I don't think you have a facial challenge here. I may be wrong, and you should push back if I'm wrong. I think we're probably describing it in the same way but using different labels. It is an overly broad policy. It does contain a sweeping default rule. It does have the absence of any preapproval procedure. And then when you look to the actual application of it, there's the suggestion by the district that there was a preapproval process. There's the suggestion by a concession by the district that this recording could have been released after these investigations were completed, which doesn't square with the fact that my client was being disciplined for discrediting the department through the release. He didn't try to get approval, though, right? So I'm not sure where you would go with this. The rule, as you point out, says prior approval is required. You're making an argument now, which frankly I did not read in the brief, that there wasn't a process to permit them and that that's the real problem here. But your client didn't try. Isn't that right? That's correct. So I'm not clear if he has any standing to make an argument that the problem here is a lack of an approval process. Let me ask you just one last question since we're way over time. Do you think that the government's position is stronger by having a rule that says don't disclose this information than it would be if it simply punished people after the fact for disclosing information that on balance it thought was jeopardizing an investigation? They just had a flat rule that said, which I believe the government believes they have, but a flat rule that bars this kind of information. Does that put them in a stronger or weaker position? I think just a bar puts them at even. Just puts it even. So how is that consistent with Connick? In Connick v. Myers, the Supreme Court does a pickering analysis on the question of whether sending around of a questionnaire was allowed, and the court said if there were a rule, the violation of such a rule would strengthen the district attorney's position. The point being to give people advance notice, and then if they violated it, they violated it. I thought that was your position, because that certainly is a position reflected in the briefs. That seems inconsistent with the court's admonition in Connick. Well, I mean, I do think it's an argument the district would raise, and I appreciate that the court has acknowledged that hypothetically putting someone on notice puts you in a better position. But the fact of the matter is the pickering analysis does ask the court to look at the actual harm, weigh things after the fact. And so whether or not someone is told we're going to violate your constitutional rights ahead of time or is punished after the fact. That's one of those ones where you assume the answer in the question. I think with that, we'll hear from the other side. Thank you. Good morning, and if it pleases the court, I'm Mary Wilson, representing the District of Columbia and the individual police officers named as defendants in this case. The district court got the First Amendment issue right. The district does have a rule prohibiting disclosure of information of this type, and the plaintiff violated it at his peril. Information of this type. Well, the two categories, confidential information that may jeopardize the successful conclusion of an investigation, and all documents not listed as releasable. And this document fell into both categories. So whether you apply the pickering NTEU balancing test, I think the court's questioning has highlighted that the police department has an extremely strong interest in not releasing just days after this barricade incident information that might relate to the trial, to the suspect's defense, to the investigation of the use of force, to future, not just future emergency response team proceedings, but to the fairness of the entire criminal investigation. Can you give us just some examples of how this transcript, the portion that's in the record, just more concretely, how its release might have jeopardized an ongoing criminal investigation? Just give us a little more granularity on that. Well, first, I don't think the court has the entire recording. At his second internal affairs interview, the plaintiff said that he himself did not listen to the entire recording. So we don't know on what basis MPD made the decision that it would only be released for internal use, because the entire recording is not in the record. And the entire recording was not listened to by the plaintiff. But in general, I think, as the court said, you do have to defer to MPD's determination that this might jeopardize. And just give us more in the record. Just run it down to ground. What about this? How? I read it, and I thought, this actually puts the department in really good light. It didn't give me much sense of anything that was going on. As I recall, there's somebody radioing somebody who's on a crime scene with a barricade. And the radioing in person says, we're being given permission or we're being pressured to give you the go-ahead to use gas. And the guy on the scene says, no, gas, we're not ready for that. That doesn't make sense. And the guy in the back says, well, okay. And the guy down in front then says, well, it's kind of embarrassing here, but actually, also, there are people in the line of fire. So also, not only don't use gas here, but don't start shooting to try to get this barricaded guy out, because there could be some department people. And it's embarrassing, because the chief shouldn't be setting the line of fire in a crisis situation. But it all showed the department, to its credit, having people on the ground who were level-headed and said, take a deep breath. We're dealing. I think we're going to resolve this. And then they did. So I'm reading them. I'm thinking in the investigation of, first of all, the two things that were under investigation. One was the use of firearm against the barricaded man. I don't see anything in that that I can imagine sort of relevant to or could jeopardize that investigation. The investigation into why the fleeing man is there and what's going on. You know, spell it out for me. Again, the police department listens to the entire recording. And more than that was released to Bauman. And more than that was released to the press. He says he released, I think, 12 minutes. But you didn't put it in records. So just give us. No, because it would jeopardize the investigation. This is a tape of communications between members of the emergency response team who are observing a barricade situation in which somebody has fired shots, right? Yes. So in the normal circumstance like that, the radio chatter is going to include the descriptions the officer sees of the site, correct? Yes. Where the gunman is. Yes. Did the gunman fire? Yes. Did the police fire before or after the gunman fired? Yes. In the barricade situation in Waco, the tapes of what happened on the outside were quite important to the investigation of who fired first. Absolutely. Was an appropriate degree of force used or not used? All those things seem to me to be obvious elements of an emergency response team communication. Is that wrong? No, that's absolutely right. And even though that's not in the little snippet that we have to defer to MPDs. Before you tell me what the law is, I just want to find out what the facts are. It's also the case that you don't know what's in there. And all you can do is predict in advance what's likely to be on an emergency response team tape, right? And so you have a rule that says don't release bad information, right? That may jeopardize, yes. Well, you have a rule that says all documents not listed, and this is a document that's not listed. So this is the kind of document you don't want released, at least not until somebody reviews it, makes a final determination, and then decides that it's all right. Or maybe in the end it will go to the, no doubt will go to the defendant in the case in which he is trying to defend himself. He shot because the police fired first. He shot because he was afraid. Any of those things are all elements of an investigation? Yes. Is that right? No, that's absolutely right. Thank you for that analysis. Because that's precisely what the MPD's concerns about the criminal prosecution, the suspect's defense, what can be gleaned about what happened on the scene, and... And on the use of force investigation, which is the internal affairs investigation, the question is were the officers in danger, right? Did they feel a need to use force to protect themselves or other individuals under the Garner test? The only way you can know the answer to that is you're going to hear two voices. You're going to hear what the police officers are saying at the time, and in the end you'll hear what the object and the person who the force was used against are going to say. Those two seem to me to seem blindingly obvious elements of any investigation. We agree. And as the court already pointed out, Cunningham requested the recording just within a day or two of the incident when everything was fresh and they had just begun the investigation, and it was MPD's prerogative to say we're going to hold this back until the investigations are complete and to protect the suspect's rights and the MPD's interest in both the internal and the criminal investigation. So I certainly agree with your explanation of the potential jeopardy to MPD. So all that may be true, and I understand Appellant's argument in part to be that he is the president of the union. He is obviously concerned about the safety of the union members. He has information that some of his members may have been in jeopardy at the time, and he's being told by the media that there may have been an order to use tear gas. And I understood much of the thrust of his argument is that in connection, even though he's speaking as a private citizen, his interest arises in terms of what I'll call the proper operation of the department, whether these emergency response teams are properly organized, much less whether there is an attempted cover-up by the police department as to what was actually going on at the time. So he argues when you balance that against what he says is a tape that doesn't say much, that the district court had to do more and require more of the government to indicate why the tape was important. And while the chief judge has listed a lot of reasons, I haven't read the entire transcript of what went on in the district court, but certainly in the district court's opinion, it's just a statement. It's obvious, but it doesn't go any further. Yes, well, first, MPD did release the recording to the plaintiff in his capacity, or to the vice president of the union, for purposes of internal review. So to the extent they had a concern of investigating this on behalf of the union, the safety concerns, there was no restriction on him reviewing it internally within the MPD, so that the safety concern was met that way. There was also no restriction on him expressing his views to the press. He knew from people telling him he didn't need the tape, that there had been an order to use, or as he understood it, an order to use tear gas and concerns about the management of the scene. He was... Oh, sorry. I'm going to let you finish your sentence. I do have a question. The media policy in no way restricts his ability as a private citizen to express his concerns about what happened at the barricades. So under the... So there are these two different elements of the policy, and one is may recognize an ongoing investigation, and the other is anything not listed. And it seems like the anything not listed you'd have to concede is way overbroad. For example, if you had a tape of police radio chatter that was otherwise nonpublic that disclosed police officers making sexist or racist remarks about one another, about members of the public, and there was no investigation pending, and somebody got a hold of that and said, this is shocking, we need confidence in our police departments. And they went and they asked, they said, I'm planning to release this, so take a look, so you'll be ready. And the department said, oh, no, that's not listed. And the person thought, well, under Weaver, I have a First Amendment right to disclose that, and they went and disclosed it. And are you saying that the fair violation of the policy requiring nondisclosure of documents not listed would trump the First Amendment interest of that public employee? Well, the media policy establishes a process. Right, and I'm saying the person went through the process. Well, and then you have FOIA and subpoenas. If that person disclosed it that way in a timely manner, didn't wait the year and a half it would take to get it under FOIA, that they could be subject to discipline. I would have to double check with NPD, but I think NPD's position would be that under subsection 7, all documents not listed as releasable,  At their peril. And you as a lawyer would say that that trumps the First Amendment interest of the public and public employee to disclose something that would not jeopardize, I'm by hypothesis saying it would not jeopardize any ongoing investigation. It's on a matter of public concern. Well, under a First Amendment analysis on the balancing, every case has its own facts and own facts to be balanced. So you're saying no, that every case doesn't have its own facts, that the policy level is the level at which we do the balancing. And I'm testing that. I'm pushing back on that because I agree with you. Well, I clarify that for violating the media policy, for violating subsection 7, they violated at their peril to be disciplined under this. If you bring a First Amendment challenge, then in any particular case the department would have to do the balancing. And in your hypothetical, the department would have less of an interest if there's no criminal investigation going, if there's been no use of force, that there could be circumstances where. Okay. So if every case has its own balancing on a First Amendment challenge, and that's where we are, that's what Mr. Baumann is doing right now, is bringing a First Amendment challenge, that same reasoning applies to not only to subsection 7 but also to subsection 1, no? No. Not jeopardizing an ongoing investigation. There's a balance in there. So you're saying we're happy. There we've got the goods. Balance is going to go in our favor, right? I was on the first one. Are you saying there's a balancing if the person applied in advance and was turned down or if it took too long? Or are you saying there's always a balance? I thought your position was you can't just release these on your own. These are government documents. You can't just decide on your own to release these. You have to get permission. Yes, there's a problem. And then if you ask for permission in the circumstance that Judge Pillard was saying and the police were to say no, and at that point you bring a case saying, either in advance or afterwards, saying the only reason they turned it down was because it showed racist or sexist remarks, there would be a balancing, and in that circumstance the government would lose. But that's a different case. That's a case where somebody tried in advance. The police were given an opportunity to determine whether this particular document had a problem or not. Right? Yes. And he did never ask. He never went to his chief. He never went through the process. But is that enough? I mean, that's a violation of his employment contract. But is that something that trumps his First Amendment right? It doesn't seem like that can be right. You can set up a policy requiring preclearance for everything, including things that the government has no First Amendment entitlement to withhold, and you're not going to be punishing the employee for his disclosure of matters on issues of public concern that don't harm any substantial interest of the department. You're merely going to be punishing him for violating the policy. That seems like that sort of bootstraps the First Amendment analysis right out of the picture in favor of an overbroad indiscretionary policy that the department has used as a trump. Well, I think when you have a law enforcement agency like MPD that has many documents that could jeopardize the criminal investigation, jeopardize the lives of informants, jeopardize someone's right to a criminal defense, that the default is unless we have specifically listed a document as releasable, all documents not listed as releasable shall be closed to the public to protect that interest. Like the State Department in Weber, which has international affairs interests of the most highly sensitive nature with countries around the world, including countries that have nuclear weaponry, and there our court said pre-publication scrutiny, fine, but pre-publication approval, no. But the distinction, as I think the court already pointed out, is that there it was the plaintiff's own writings and own speech. And here it's a government document. I think I was the one who pointed that out. But nonetheless, the information in issues are similar. So I'm someone who's served in the Caribbean, and I know all kinds of things about the State Department's relations with Cuba, let's say. And I'm writing my own book, and it's always just my own words. No, of course the State Department has an enormously important interest there. Nonetheless, the court would not read the State Department's policy because it believed it would be unconstitutional, as the policy so stated, that you have to wait before you can say anything until you have our approval. Our court pushed back and said, no, we're going to use our interpretive latitude under the Constitution. We're going to read this policy to require only that we get to look at it, not that it can be withheld until we give our approval. Your policy is much more aggressive than that, and I'm wondering if you think that that can really stand under Weber. The subsection 7 policy. Well, the subsection 7 policy, and may I point out that Chief Lanier's decision upholding the discipline, she only cites one. She upholds it under one, not under seven. Is that something you stand by and say, this is what we're, we're standing on one, not on seven? Well, he was trying to stand on both one and seven. They challenged both one and seven, but the ultimate decision by the chief cites only one. She doesn't cite to seven. One being, may jeopardize ongoing investigation. Yes. Yes. And I would also like to point out that the plaintiff hasn't parsed the media policy in this way. But I think, Your Honor, under the NTEU and Pickering balancing that, again, under the facts of this case, the NPD does have this interest to have an extremely serious interest in keeping many of its documents confidential, and to protect that interest, the default rule is, yes, the documents are not releasable. And under the circumstances of this case, where there was a procedure available to balance his interest before he released it. Is he being punished at all for not using the procedure? It seems to me that has to fall away for the reason that I was saying. You can't bootstrap your interest into, well, whatever our interest may be, Pickering worthy or not, we don't have to go there because he violated the rule. Well, I'm saying he violated the rule at his own peril that he decided he would release it. Right. But he's saying, okay, I'm willing to take that chance because the peril involves Pickering balance. And as long as it doesn't excuse the government from having to show that it has weighty interest, apart from the rule following interest, under Pickering, I'm willing to take that chance, which is where I think he is. Well, and he took that chance, and I think this court can rule as a matter of law that the balance sits in the government's favor. Because of the ongoing investigation and the points that Chief Judge Garland made about, it's got factual information about something that's still being investigated. Yes. And at least under one, it was a temporary restriction until the investigations were concluded. And the breadth of that is what? All documents relevant to an ongoing investigation? Well, confidential information that may jeopardize the successful conclusion. How do employees know? Well, you can ask your unit official's approval. As in 6A1 and 6D, how information releases shall occur. The member shall seek the assistance and advice of his or her immediate supervisor, if possible, before making a statement. Can you, Ms. Wilson, respond to the concern that was raised by the en banc court in the Sandor case about the amount of discretion that a policy that's generally worded like that leaves? It is a little bit concerning. And we see some flavor of that in this case, where there were these claims about discrediting the agency, and there was concern that it wasn't because it was jeopardizing an ongoing investigation, but in fact because it was embarrassing to the agency. But that's why they clamped down. Right. And I do want to just point out that the language in the charging document, the disciplinary document about discredit to the agency, does not relate to the media policy. It relates to a second charge. And, again, the last paragraph of Chief Lanier's decision vacates that charge. He was only disciplined for violating the media policy by releasing this document. His discipline had no analysis on that issue, had no analysis of whether he brought discredit to MPD. So the discredit, I think, is a red herring. On the discretion point. On the discretion point, thank you for bringing me back to your question. Many decisions have also said that when the agency is a law enforcement agency, you do give its determination discretion, deference, and that you have to take into account the serious mission of the police department to investigate crime and help legally prosecute people who are charged with crimes. And in balancing that, and you're protecting people's lives, informants' lives, witnesses' lives, defendants' freedom, that under the circumstances here, a police department is entitled to a certain amount of discretion. So in this case, as applied, the department had made a determination upon reviewing the tape that it should remain confidential? Yes. When Cunningham asked for the tape, he emailed the request, and they reviewed it before they released it to him, and then said this is for internal use only or words to that effect. So at least in this case, we're not dealing with the blanket situation of every tape is confidential, just as a matter of our policy. But rather, here we have where the department did exercise its discretion to determine its discretion and judgment to determine whether or not this was the type of tape that should be confidential, at least during the course of these investigations. Yes, that's a very good point, Your Honor. Thank you. That it wasn't a blanket, this is a recording, we're blocking it. They listened to it, decided it could be released to an FOP official for FOP's use, but would not be released outside. That's why I wanted this slightly more granular description of how this recording was jeopardized. Because once we're in that realm, and I think that's the appropriate analytic realm to be in, then the case law seems to suggest that the government has a burden that is a little more particular to say, and that's why I was asking the question about can you articulate what it is about this. Now that we're looking, we're not looking in a sort of forward, I'm guesstimating that this might jeopardize, but actually when the dust has settled, should this person be disciplined or not? We've got time, we're reading the whole recording transcript, what about it? Was there actual harm? And now that we know? It doesn't matter. The MPD was entitled to discipline the plaintiff even if ultimately the release did not cause harm. So, I mean, the policy said may jeopardize. So that puts it in the category of items that may rather than items that do. So I'm thinking your argument is, is this the kind of document that may? Yes, absolutely. It's a categorical question about whether officers' reports of what's happening at the scene may jeopardize the successful conclusion of an investigation. Yes, and you don't know until the conclusion of the investigation what will be relevant, what will be relevant to the suspect's defense. There's also chatter between ERT members that may divulge something about how the emergency response team operates. Have you reviewed the whole 19 minutes of the statement? No, because I am not privy to it. MPD looked at it, and MPD, which is the expert in this area, it's not me. It's not now been released publicly? Not that I know of. Has the investigation concluded? I don't know the answer to that. The criminal prosecution, I mean, certainly it would be subject to a FOIA request at this point, or the plaintiff could go to his supervisor now and say, you know, if these investigations have concluded, I would like to release the entire tape. But there's no indication the plaintiff has asserted that there's been a conclusion of the investigation. So I don't think we're at that point. Okay. Any questions? Thank you, and we would thank you for your help with some questions, and we will urge the court to respond. Okay. Does the plaintiff have any time? The appellant does not have any time. You went way over with the other side, so we'll give you another two minutes. Your Honor, I would just like to quickly address some of your inquiries on this sea change, if you will. And Judge Gillard's hypothetical, I think, is the best way to illustrate that this is not a sea change, that this is on all fours with precedent. If the MPD has a recording that has nothing to do with tactical issues, and it has comments, whether they're racist or otherwise, that's in the public interest to disclose, and a member, such as my client, goes to the MPD and asks for permission, and that permission is denied, my client theoretically could file a First Amendment lawsuit to compel the production of that document and to allow the publication of that document. The question the court would be called upon to ask is whether or not, under Pickering, the balance weighs in favor of producing that document. Now, Your Honor's questions were, shouldn't there just be an absolute ban? Why should we get into the particular facts? If Your Honor's hypothetical is the law, then under Your Honor's standard, the court would look at it and say, well, could that recording ever have possibly bad information that we don't want out? If so, it's never required to be produced. That's not consistent with the First Amendment. I understand the problem, but then, so what do you say about what we said at Boehner about grand jury information? Imagine the grand jurors are talking about racist remarks in the grand jury. Would one of them have the ability, without seeking permission, without going to court, without doing anything else, to just release the information? Well, I think that person puts themselves in criminal jeopardy, but I still think the court has an obligation to do Pickering balancing to determine if the First Amendment trumps that statutory prohibition. It may not, and that's quite a risk that somebody has to take, and my client took that risk. So in each of these cases, and again, not to bring this too close to home, but if internal court documents are released, it would require the judge who did the punishment to explain to the court as a witness. I take it you're saying this has to go to trial, there has to be a Pickering balance, et cetera. Every time a document's released, we'd have to explain why this particular document is of significant importance. Yeah, I think under Pickering, that is the standard. I don't see that as a sea change. I don't think because it's a document or because it's what a State Department worker has in their photographic memory of incidents, I don't think there's a material difference. It's Pickering, it's the precedent. It may not be perfect in every case, and there may be a hypothetical where it's overstepping, but I still think the court owes the duty to the First Amendment to do that way. There wasn't a balancing in Aguilar either. It's the same series of questions. You have information that was obtained in a way that violated the statute, and that was the end of the matter from the First Amendment point of view. Well, maybe a sea change is necessary, but it does strike me as a considerably different way of thinking about the release of a particularly investigative document. Are there further questions? Thank you. Thank you very much. We're going to be allowing these lawyers to leave and others to come up, and so there will just be a few minutes of trading places. We'll take them out on their stay.
judges: Garland, Rogers, Pillard